UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


CYNTHIA CLAIRE MILLER

CIVIL ACTION

VERSUS

NUMBER 14-675-BAJ-EWD

CAROLYN W. COLVIN


## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. §636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on February 25, 2016.


**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

CYNTHIA CLAIRE MILLER

CIVIL ACTION

VERSUS

NUMBER 14-675-BAJ-EWD

CAROLYN W. COLVIN

**MAGISTRATE JUDGE'S REPORT**

Plaintiff Cynthia Claire Miller ("Plaintiff") brought this action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner") denying her application for Title II disability insurance.

Based on the applicable standard of review under § 405(g) and the analysis which follows, the Commissioner's decision should be affirmed.

**I.      Procedural History**

Plaintiff filed an application for Title II disability insurance benefits alleging that, as of May 25, 2007, she was disabled and no longer able to work because of diabetes, back problems, depression, and anxiety.   (AR pp. 118-119, 148).[1][2]   Plaintiff subsequently amended her alleged onset date to October 1, 2010 at the hearing.   (AR p. 13).[3]

---

1 References to documents filed in this case are designated by "(Rec. Doc. [docket entry number(s)] at [page number(s)]."   References to the record of administrative proceedings filed in this case are designated by "(AR [page number(s)]."

2 Plaintiff was 54 years old at the time of the administrative law judge's ("ALJ") decision. Plaintiff has a high school education, and was previously employed as a cashier and retailer stocker.   (AR pp. 134-137 & 149).

3 Plaintiff's insured status for Title II disability insurance benefits eligibility ended on December 31, 2012.   (AR pp. 15 & 130).   Plaintiff was 48 years old at the time she alleged disability onset and 54 years old when her Title II disability insured status expired.   (AR pp. 15 & 118).   Plaintiff's age placed her in the category of a "younger person." 20 C.F.R. § 404.1563(c).   In July 2008, the plaintiff turned 55, which placed her in the category of "person closely approaching advanced age."  C.F.R. §§ 404.1563(e).

Plaintiff's claim was initially denied and Plaintiff filed a request for hearing. A hearing was held on January 19, 2013, at which Plaintiff, represented by counsel, appeared and testified. (AR p. 30). A vocational expert, Thomas Meunier, Jr., also appeared and testified. (AR p. 30). An unfavorable decision was rendered by the ALJ on March 28, 2013, finding that Plaintiff was not disabled from October 1, 2010 (the alleged onset date) through December 31, 2012 (the date last insured). (AR pp. 13-25). On April 22, 2014, the Appeals Council denied Plaintiff's request for review. (AR pp. 5-7). On August 22, 2014, the Appeals Council set aside the initial denial to consider additional information and again denied review. (AR pp. 1-3). Accordingly, Plaintiff exhausted her administrative remedies before filing this action for judicial review and the ALJ's decision is the Commissioner's final decision for purposes of judicial review.

## II.    Standard of Review

Under 42 U.S.C. § 405(g), judicial review of a final decision of the Commissioner denying disability benefits is limited to two inquiries: (1) whether substantial evidence exists in the record as a whole to support the Commissioner's findings, and (2) whether the Commissioner's final decision applies the proper legal standards. *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). If the Commissioner fails to apply the correct legal standards, or provide a reviewing court with a sufficient basis to determine that the correct legal principles were followed, it is grounds for reversal. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981); *Western v. Harris*, 633 F.2d 1204, 1206 (5th Cir. 1981); *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

If substantial evidence supports the Commissioner's findings, they are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 1422 (1971); *Martinez v.*

*Chater*, 64 F.3d 172, 173 (5th Cir. 1995).   Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion.   It is more than a mere scintilla and less than a preponderance.   *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).   A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.   *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).   Conflicts in the evidence are for the Commissioner to decide, and if substantial evidence is found to support the decision, the decision must be affirmed even if there is evidence on the other side.   *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002); *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).   In applying the substantial evidence standard the court must review the entire record as whole, but may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner, even if the evidence weighs against the Commissioner's decision.   *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**III.    ALJ's Determination**

A claimant has the burden of proving that he or she suffers from a disability, which is defined as a medically determinable physical or mental impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful activity.   20 C.F.R. §§ 404.1505; 416.905.   The regulations require the ALJ to apply a five-step sequential evaluation to each claim for benefits.   20 C.F.R. §§ 404.1520; 416.920.   In the five step sequence used to evaluate claims the Commissioner must determine whether: (1) the claimant is currently engaged in substantial gainful activity; (2) the claimant has a severe impairment(s); (3) the impairment(s) meets or equals

the severity of a listed impairment in Appendix 1 of the regulations;[4]  (4) the impairment(s) prevents the claimant from performing past relevant work; and, (5) the impairment(s) prevents the claimant from doing any other work.   *Masterson*, 309 F.3d at 271.

The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability, and if the claimant is successful in sustaining his burden at each of the first four levels then the burden shifts to the Commissioner at step five.   *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).   If the claimant shows at step four that he is no longer capable of performing past relevant work, the burden shifts to the Commissioner to show that the claimant is able to engage in some type of alternative work that exists in the national economy.   *Myers*, 238 F. 3d at 619.   If the Commissioner meets this burden the claimant must then show that he cannot in fact perform that work.   *Boyd*, 239 F.3d at 705.

Here, the ALJ found that the plaintiff had not engaged in substantial gainful activity since October 1, 2010 through the date last insured on December 31, 2012.   (AR p. 15).   At the second step, the ALJ found that the plaintiff's degenerative disc disease of the lumbar spine, obesity, and depression were severe impairments.[5]   (AR pp. 15).   At the third step, the ALJ concluded that the plaintiff's combination of severe impairments did not meet or medically equal the severity of any listed impairment.   (AR p. 16).

---

[4] Listed impairments are descriptions of various physical and mental illnesses and abnormalities generally characterized by the body system they affect.   Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results.   For a claimant to show that his impairment matches a listed impairment he must demonstrate that it meets all of the medical criteria specified in the listing.   An impairment that exhibits only some of the criteria, no matter how severely, does not qualify.   *Sullivan v. Zebley*, 493 U.S. 521, 529-32, 110 S.Ct. 885, 891-92 (1990); 20 C.F.R. §§ 404.1525; 416.925.

[5]  The ALJ found that Plaintiff's other medical conditions of hypertension and diabetes were controlled without complications, and not severe.   (AR p. 15).

The ALJ then evaluated the Plaintiff's residual functional capacity ("RFC") to determine whether, despite her severe impairments, she was able to do any of her past relevant work or other work in the national economy.   (AR pp. 17-24).   The ALJ found that the Plaintiff retained the ability to perform light work, with the following restrictions: (1) requires ability to alternate between standing two to three hours at a time and sitting for thirty minutes at a time; (2) no crawling; (3) limited to occasional climbing, balancing, stooping, squatting, and kneeling; (4) limited to simple, routine, and repetitive work tasks; (5) no interaction with the general public; (6) no more than occasional interaction with supervisors or co-workers, and (7) have ready access to the bathroom.   (AR p. 17-23).   Given this RFC, the ALJ concluded that the Plaintiff was unable to perform her past relevant work.   (AR p. 23).   The ALJ next considered Plaintiff's age, education, work experience, RFC with limitations, and the hearing testimony of vocational expert Thomas Meunier, Jr.   Based on this evidence, the ALJ found that the Plaintiff would be able to make a successful adjustment to other work that existed in significant numbers in the national economy, namely, a maid, janitor, and/or food preparation worker.   (AR p. 24).   Therefore, the ALJ concluded at the fifth step that the Plaintiff is not disabled.   (AR p. 25).

## IV.     Plaintiff's Allegations of Error

Plaintiff alleges that the ALJ committed the following errors that require reversal of the ALJ's decision: (1) the ALJ failed to afford appropriate weight to the opinion of treating psychiatrist Dr. John K. Jackson; (2) the ALJ incorrectly relied on an alternative definition of light duty and improperly weighed the treating and consultative doctors' opinions in determining an RFC for light work; and (3) the ALJ failed to discuss the side effects of the Plaintiff's medications on her ability to work.

## V.    Analysis

### 1.   The Treating Source Rule

Plaintiff argues that the ALJ failed to afford appropriate weight to the medical opinion of her treating psychiatrist, Dr. John Kevin Jackson.   While the court agrees that generally, a treating physician's opinion should be accorded great weight,[6] here, we find that the ALJ's decision to afford "little weight" to Dr. Jackson's Mental Medical Source Statement was supported by substantial evidence and is therefore not a ground for reversal or remand.[7]

The ALJ may reject the treating source's opinion when "'there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-

---

6 Generally, the "opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *see also* 20 C.F.R. § 404.1527(c)(1) (examining physician opinion given more weight than non-examining physician).  The *Newton* Court held that before an ALJ declines to give "any weight" to the opinions of the claimant's treating specialist, the ALJ must consider: (1) the physician's length of treatment; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) consistency of the opinion with the record as a whole; and (6) the physician's specialization.   209 F. 3d at 456.

7 Here, the ALJ gave "little" (as opposed to no) weight to Dr. Jackson's opinion as set forth in the Mental Medical Source Statement.   The ALJ's decision noted that Dr. Jackson had seen Plaintiff for three 30 to 45 minute treatment sessions on March 22, 2011, December 19, 2011, and March 26, 2012 and based the weight given to the Mental Medical Source Statement on a finding that the statement was not supported by Dr. Jackson's own treatment notes. Under the regulations, a "treating source" is defined as a medical source that has or has had "an ongoing treatment relationship" such that the medical evidence shows that Plaintiff sees or has seen "the source with a frequency consistent with accepted medical practice for the type of treatment." 20 CFR § 404.1502.   Opinions from treating sources are generally given more weight "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of Plaintiff's impairments.  20 CFR § 404.1527(c)(2).   Where no such longitudinal pattern of care is shown, the Fifth Circuit has held that an ALJ is not required to give that professional's opinion greater weight.   *See Clayborne v. Astrue*, 260 Fed. Appx. 735, 737 (5th Cir. 2008) (doctor properly rejected as treating source where "isolated visits" did not amount to an "ongoing treatment relationship" with doctor); *Hernandez v. Heckler*, 704 F.2d 857, 860–61 (5th Cir.1983) (doctor who only saw claimant twice in a 17–month period was not a treating physician); *Taylor v. Astrue*, 245 F. Appx. 387, 391 (5th Cir.2007) ("[N]othing about Taylor's relationship with Dr. Weisberg establishes the 'longitudinal' pattern of care described in [the regulations]; Taylor's two visits to Dr. Weisberg, four years apart, are the sort of "individual examinations" that are distinguished ... from the continuous care provided by a treating physician.").   Given Dr. Jackson's limited interaction with Plaintiff (i.e., three 30-45 minute sessions over the course of a year), it is not clear Dr. Jackson necessarily meets the definition of a treating physician.   However, the Commissioner has not argued Dr. Jackson is not a treating physician and therefore the court assumes he is.

founded than another.'" *Walker v. Barnhart*, 158 Fed. Appx. 534, 535 (5th Cir. 2005) (quoting *Newton*, 209 F.3d at 458). If the ALJ's decision is supported by substantial, contradictory, first-hand evidence from another physician, the ALJ is "not required to go through all six steps in *Newton* [because] . . . the ALJ is responsible for resolving conflicts in the evidence, and we will not substitute our judgment for his." *Cain v. Barnhart*, 193 Fed. Appx. 357, 360 (5th Cir. 2006) (citing *Newton*, 209 F.3d at 452, 458; *Walker*, 158 Fed. Appx. at 534)). Further, "the ALJ may give 'less weight, little weight, or even no weight' to the opinion of a treating physician upon a showing of good cause." *Ray v. Barnhart*, 163 Fed. Appx. 308, 313 (5th Cir. 2006) (quoting *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001)). In summary, an ALJ is free to discredit the opinion of a treating physician when it is contradicted by the evidence in the record. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (ALJ may reject a treating physician's opinion in favor of an examining physician where the evidence supports a contrary conclusion). Where an ALJ has found a treating physician's opinion to be inconsistent with that physician's own treatment records and other evidence in the record, this court has affirmed the ALJ's rejection of that opinion. *See Villar v. Colvin*, 2015 WL 7731400 (M.D. La. 10/9/2015).

The record reflects that Plaintiff's mental health care was transferred to Dr. Jackson on March 22, 2011, and that Plaintiff was examined by Dr. Jackson on March 22, 2011, December 19, 2011, and March 26, 2012. (AR pp. 241-43; 220-34; 210-12). Thereafter, Dr. Jackson completed a Mental Medical Source Statement on January 17, 2013. (AR pp. 471-76). [8]

---

8 Based on the record, it appears that Plaintiff's last treatment/exam with Dr. Jackson occurred on March 26, 2012. It does not appear that Dr. Jackson examined Plaintiff contemporaneously with completing the Mental Medical Source Statement. The document appears to have been faxed to Dr. Jackson's office by Plaintiff's counsel on January 16, 2013 and returned on January 17, 2013. The record does not contain any treatment notes during this time period.

Ultimately, the ALJ afforded Dr. Jackson's Mental Medical Source Statement "little weight" because he found it was "unsupported by [Dr. Jackson's] treatment notes, which show few findings and little change in the claimant's condition since she first presented to him...."   (AR p. 23).

Treatment notes from Plaintiff's March 22, 2011 initial exam with Dr. Jackson include a mental status exam reflecting that Plaintiff presented as well-groomed with proper attire and hygiene, that her thought process was goal-directed, her speech normal, her affect "blunted," and her judgment and insight fair.  (AR pp. 241-42).   During her initial exam, Plaintiff reported that she had been doing "pretty good," that her appetite was good, and that she had "no feelings of helplessness, hopelessness or worthlessness (other than a few fleeting times)."   (AR p. 241).

Dr. Jackson examined Plaintiff again on December 19, 2011.   At that time, Plaintiff reported additional family and holiday stress and hair loss.  (AR p. 220-21).   Dr. Jackson's mental status exam notes indicate that Plaintiff presented as well-groomed, with goal-directed to circumstantial thought process, normal speech, fair judgment and insight, and good rapport.  (AR pp. 221-22).   Her affect was reported as anxious and her mood "stressed." (AR p. 221).[9]

Finally, Dr. Jackson examined Plaintiff on March 26, 2012.   During that exam, Plaintiff reported that she was sleeping "pretty good," but that pain was sometimes interfering with sleep.  (AR p. 211).   She reported that while compliant with medications, she did have "days of being more depressed" and was frustrated with an inability to do things such as gardening due to pain.  (AR p. 211).   Dr. Jackson's mental status exam notes indicate that Plaintiff presented as well-groomed, with goal-directed to circumstantial thought process, normal speech, fair judgment and

---

9 Although Dr. Jackson's December 19, 2011 treatment notes indicate he excluded Plaintiff from a weight management program because of "mental health," it is not clear whether this comment was related to Plaintiff's overall mental health or the fact that she was experiencing more stress than normal at the time of this visit.  (AR p. 224).

insight, and irritable mood.   (AR pp. 211-12).

Dr. Jackson's treatment notes reflect Global Assessment of Functioning ("GAF") scores of 55 on March 22, 2011; and 50 on December 19, 2011 and March 26, 2012.   (AR p. 209).

In the January 17, 2013 Mental Medical Source Statement, Dr. Jackson reported his clinical findings that Plaintiff was depressed, with a frustrated mood, irritable affect, and irregular sleep. (AR p. 471).   When completing the check boxes provided in the form, Dr. Jackson checked that Plaintiff had "no useful ability to function"[10] in the areas of maintaining regular attendance and punctuality, completing a normal work day and week without interruption due to psychological symptoms, performing at a consistent pace without unreasonable rest periods, dealing with normal work stress, setting realistic goals and working independently, interacting appropriately with the general public, maintaining socially appropriate behavior, and using public transportation.   (AR pp. 473 & 74).   Further, Dr. Jackson checked that Plaintiff was "unable to meet competitive standards"[11] in the areas of remembering work-like procedures, understanding and remembering short and simple instructions, working in coordination with others without being unduly distracted, accepting instructions and criticism from supervisors, getting along with co-workers, understanding and remembering detailed instructions, carrying out instructions, dealing with stress of skilled or semi-skilled work, and travelling in unfamiliar places.   (AR pp. 473 & 74). Additionally, Dr. Jackson checked that on average Plaintiff would miss more than four days a month due to impairments or treatment.   (AR p. 475).

---

10 The Mental Medical Source Statement defines "no useful ability to function" as "an extreme limitation" such that "your patient cannot perform this activity in a regular work setting."  (AR p. 473).

11 Per the Mental Medical Source Statement "unable to meet competitive standards" means "your patient cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting."  (AR p. 473).

Plaintiff argues that the ALJ's determination that Dr. Jackson's treatment notes do not show any significant change in Plaintiff's condition since March 22, 2011 is "a gross misstatement of the medical record." (Rec. Doc. 5, pp. 8-9). In support, Plaintiff relies on her self-report of hair loss in December 2011 and Dr. Jackson's "downgrad[ing]" of GAF scores from 55 to 50. (Rec. Doc. 5, p. 9).[12] As noted above, the ALJ ultimately placed "little weight" on Dr. Jackson's Mental Medical Source Statement because he found it was unsupported by Dr. Jackson's own treatment notes. Dr. Jackson's treatment notes, including those outlining the results of Plaintiff's Mental Status Exams and her self-reporting of doing "pretty good," constitute substantial evidence supporting the ALJ's determination that little weight should be afforded to Dr. Jackson's January 17, 2013 Mental Medical Source Statement.[13] Additionally, the court notes that at each visit Dr. Jackson assessments that Plaintiff was "well groomed," that her thought process was "goal directed," and that her judgment and insight were fair constitute substantial evidence of the ALJ's

---

12 To the extent Plaintiff is asserting that her GAF scores should be given controlling weight, the court notes that the Commissioner has determined that GAF scores do not have a "direct correlation to the severity requirements of the mental disorders listings." 65 Fed. Reg. 50,746, 50,765-66 (Aug. 21, 2000). Courts have reasoned that "it would be an error for an administrative law judge to focus on a doctor's assessed GAF scores, rather than the doctor's findings and opinions, to credit or discredit medical evidence. Simply put, an administrative law judge cannot draw a reliable inference from a single GAF score, standing alone." *Locure v. Colvin*, 2015 WL 1505903, at *11 (E.D. La. April 1, 2015) (quoting *Martinez v. Colvin*, 2014 WL 3735889, at *3 (D. Mass. July 11, 2014)). Moreover, Dr. Jackson does not provide an explanation for the scores, or indicate the objective findings, if any, upon which the scores are based. *Ray v. Barnhart*, 163 Fed. Appx 308, 313 (5th Cir. 2006) (psychologist's opinion was properly discredited where his report did "not include an explanation for the GAF rating" given to claimant). Accordingly, the court does not find Plaintiff's GAF scores, recorded without explanation or other supporting details, are sufficient to require reversal or remand of the ALJ's decision.

13 Plaintiff additionally argues that the ALJ "failed to even consider, much less discuss the complex interrelationship between Ms. Miller's physical pain and mental status, which is continuously identified by Dr. Jackson." (Rec. Doc. 5, p. 10). Plaintiff points to the Mental Medical Source Statement and Dr. Jackson's statement therein that "[p]ain is related to her mood and as mood worsens, pain worsens" and his "guarded" prognosis "as [patient's] mood is related to physical pain." (AR pp. 471 & 474). As discussed herein, the ALJ relied on Dr. Jackson's treatment notes – which reflect both Plaintiff's complaints of chronic pain and of depression – to determine the appropriate weight to place on the Mental Medical Source Statement. Accordingly, any consequences of Ms. Miller's physical impairments on her mental state were considered by Dr. Jackson as reflected in his treatment notes (and in turn by the ALJ in discounting the Mental Medical Source Statement based on those treatment notes).

determination.

## 2. The ALJ's Determination That Plaintiff Can Perform Light Work

### a. The Definition of Light Work

Plaintiff argues that the ALJ incorrectly relied on an alternative definition of "light duty" work when determining Plaintiff's Residual Functional Capacity ("RFC"). (Rec. Doc. 5, p. 11). 20 CFR 404.1567(b) defines light work as work which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." The regulation goes on to explain that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling or arm and leg controls." *Id*. "'Frequent' means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." SSR 83-10, 1983 WL 31251. See also, SSR96-9P, 1996 WL 374185 ("If an individual is able to stand and walk for approximately 6 hours in an 8-hour workday (and meets the other requirements for light work), there may be a significant number of light jobs in the national economy that he or she can do even if there are not a significant number of sedentary jobs.").

In his decision, the ALJ found that Plaintiff had the RFC to perform light work "as defined in 20 CFR 404.1567(b)" with certain restrictions. (AR p. 17). As noted above, the ALJ placed the following restrictions on Plaintiff's residual functional capacity to perform light work: (1) requires ability to alternate between standing two to three hours at a time and sitting for thirty

minutes at a time; (2) no crawling; (3) limited to occasional climbing, balancing, stooping,

squatting, and kneeling; (4) limited to simple, routine, and repetitive work tasks; (5) no interaction

with the general public; (6) no more than occasional interaction with supervisors or co-workers;

and (7) have ready access to the bathroom.   (AR p. 17-23).   The court fails to see, and Plaintiff

has not pointed out, how this definition of "light work" is inconsistent with Social Security's

definition.

### b.   The ALJ's Determination That Plaintiff Can Meet the Standing/Walking Requirements for Light Work

Plaintiff's real argument appears to be that she does not agree with the ALJ's determination

that she could engage in "light work" because limitations by Dr. Staires would not permit Plaintiff

to stand for 6 hours out of an 8 hour workday.   SSR 83-10, 1983 WL 31251.[14]   Specifically,

Plaintiff asserts that when the sitting and standing limitations set forth by her pain management

physician, Dr. Staires[15] "are applied to Social Security's definitions of light and sedentary work,

the claimant would be classified as unable to meet the requirements of either light or sedentary

occupations."   (Rec. Doc. 5, p. 12).   Accordingly, the court understands Plaintiff's argument to

be that reversal or remand is necessary because the ALJ should have placed controlling weight on

the sitting and standing limitations set forth by Dr. Staires and that there is no substantial evidence

to support the ALJ's determination that Plaintiff has the RFC to perform light duty work with the

---

14 Plaintiff asserts that the "definition of light work used by Dr. Stairs [sic] does not account for the binding 6-hour standing requirement...for light work." (Rec. Doc. 5, pp. 11-12).   To the extent Plaintiff asserts that the definition of "light work" used by Plaintiff's pain management physician, Dr. Stephen Staires, is inconsistent with the controlling definition, the ALJ found the sitting, standing, and walking limitations used by Dr. Staires to be unsupported by the record and did not rely on those limitations.   (AR p. 23).

15 As set out below, in his July 7, 2010 Physical Dr. Staires determined that Plaintiff could sit for three hours, stand for three hours, walk for one hour, and drive for three hours.   (AR p. 466).

restriction that she alternate between standing two to three hours at a time and sitting for thirty minutes at a time.

While the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms…not entirely credible." (AR p. 21).[16]   In so finding, the ALJ relied on treatment notes from Plaintiff's surgeon (Dr. De Araujo), the consultative examiner's report (Dr. Davidson), the State agency medical consultant's physical assessment, Plaintiff's own testimony during the hearing, the opinion of Plaintiff's pain management physician (Dr. Staires) in part, and the treatment notes (as opposed to the Mental Medical Source Statement) of Plaintiff's psychiatrist (Dr. Jackson). (AR pp. 17-23).

During the hearing, Plaintiff testified that in a typical day, she takes a shower and then prepares a bowl of cereal for herself. (AR pp. 36-37).   Plaintiff testified that she is able to do her own dishes. (AR p. 38).   She sometimes uses the computer and is able to fix herself a sandwich for lunch. (AR p. 38).   She testified that she tries to walk around her trailer, do stretching exercises, and has two cats that keep her company. (AR pp. 38-39).   She stated that she can put together a simple supper and is able to sweep small areas. (AR pp. 39 & 40).   She stated that she can stand for two to three hours at a time,[17] can walk for "maybe a half an hour," and must use the

---

16 This court will afford "great deference" to the ALJ's credibility determination. *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000).   While an ALJ must articulate reasons for a finding that a claimant lacks credibility, such explanation "need not follow formalistic rules." *Spruill v. Astrue*, 229 Fed Appx 356, 358 (5th Cir. 2008) (citing *Falco v. Shalala*, 27 F.3d 160, 163-164 (5th Cir. 1994) (stating that credibility determinations are "precisely the kinds of determinations that the ALJ is best positioned to make.")).

17 Plaintiff originally testified that she could stand for two to three hours at a time. (AR p. 42).   She later testified that the most she could stand at one time would be two hours and that the most she could stand in an eight-hour period

restroom at least every 15 to 20 minutes.   (AR pp. 42 & 48).   She testified that she can't be around many people and has some memory issues.   (AR pp. 41 & 44).   While she stated that she could drive for a total of 30 minutes and sit for about 30 minutes at a time, she explained that the drive from her home to the hearing took an hour and a half and it does not appear she stopped during the trip.   (AR pp. 41 & 54).

On November 27, 2007, Plaintiff underwent a laminotomy, foraminotomy, and microdiscectomy.   (AR p. 299).   Thereafter, Plaintiff followed up with her surgeon, Dr. Luiz De Araujo.   On April 14, 2008, Dr. De Araujo noted that Plaintiff was "doing very well, is free of radicular symptoms of any significance, and with a normal neurologic examination."   (AR p. 286).   On June 11, 2008, Dr. De Araujo noted that Plaintiff's condition had stabilized and that while she "still has intermittent episodes of back pain which were made somewhat worse by her work conditioning program…she is essentially back to her baseline."   (AR p. 285).   On that date, Dr. De Araujo also noted that Plaintiff had undergone a Functional Capacities Evaluation "which shows her to be able to function at a light level of activities.   She is being released today to resume work within those restrictions…."   (AR p. 285).   On December 16, 2009, Dr. De Araujo noted that Plaintiff's condition had stabilized and that "if she refrains from any type of heavy physical activity she is relatively comfortable, but if she does otherwise she will be in significant pain."   (AR p. 283).   On February 16, 2011, Dr. De Araujo noted that Plaintiff was "progressing fairly well" and that "[s]he has been able to lose a good amount of weight and with that she seems to be more comfortable."   (AR p. 282).   At that time, Plaintiff reported that "if she tries to do anything

---

would be three hours total.  (AR p. 51).   The ALJ questioned Plaintiff extensively about what he perceived to be this discrepancy in her testimony.   (AR pp. 50-51).

more than light duty type activities she will have increasing pain."   (AR p. 282).

Following Plaintiff's November 27, 2007 surgery, Dr. De Araujo referred Plaintiff to Dr. Steven Staires, a physiatrist, for low back pain.   (AR p. 324).   It appears that Dr. Staires performed injections for pain management on October 30, 2008, and December 18, 2008.   (AR pp. 332 & 322).[18]   On July 7, 2010, Dr. Staires completed a Physical Capacities Assessment Form ("PCAF"); however, it does not appear that Dr. Staires examined Plaintiff in connection with completion of the PCAF as the only treatment notes from Dr. Staires relate to the exams and injections performed in 2008.   (AR pp. 466-468, 322-327, 332-335).   Per the PCAF, Dr. Staires opined that Plaintiff could lift, carry, push and pull 11-24 pounds occasionally and 0-10 pounds frequently.   (AR p. 466).   Dr. Staires indicated that in an eight-hour workday, Plaintiff could sit for three hours, stand for three hours, walk for one hour, and drive for three hours.   (AR p. 466). He noted that Plaintiff was unable to crawl, climb, or balance; was limited to occasional bending/stooping, squatting, kneeling, and twisting; was limited to frequent reaching; and was unable to use her feet for repetitive movements, such as operating foot controls.   (AR p. 466). Dr. Staires opined that Plaintiff was able to perform "light work" defined as lifting 20 pounds maximum frequently and lifting and/or carrying objects weighing up to 10 pounds and involving

---

18 Records indicate exams with Dr. Staires on October 20, 2008 (AR pp. 333-335) and December 12, 2008 (AR pp. 324-327).   Notes from Dr. Staires' October 20, 2008 physical exam reflect that Plaintiff exhibited a limp while walking, favored her right leg moderately, used a cane for support, and was able to stand on her toes and heels.   (AR p. 334).   Notes from Dr. Staires' December 12, 2008 exam indicate that Plaintiff self-reported functional limitations in the areas of climbing stairs, bladder control, doing laundry, getting up or down from a chair, housekeeping, lifting or carrying, managing money, preparing meals, shopping and walking.   (AR p. 325).   Notes from the December 2008 exam also indicate that Plaintiff reported her current exercise level to include walking around inside and outside her home on a regular basis, and exercising regularly 20 minutes or more once or twice a week.   (AR p. 325).   Like Dr. Jackson, it appears from the administrative record that Dr. Staires had relatively limited interaction with Plaintiff (i.e., two exams and two procedures performed in a two month period in 2008) and it is therefore not clear that Dr. Staires meets the definition of a treating physician.   See, *supra* n. 7.   However, the Commission has not argued Dr. Staires is not a treating physician and therefore the court assumes he is.

sitting most of the time with a degree of pushing or pulling of arm and/or leg controls or walking/standing to a significant degree.  (AR p. 467).  However, Dr. Staires specified that Plaintiff would need to alternate between sitting and standing throughout the workday.  (AR p. 467).  Dr. Staires concluded that as of July 7, 2010, Plaintiff could return to work in a lighter duty capacity with the noted restrictions.  (AR p. 468).  During the hearing before the ALJ, plaintiff's counsel asserted that Dr. Staires' functional capacity exam was "probably a better assessment of her functional capacity than even her testimony" and that "we're just going to fall back on this functional capacity exam."  (AR pp. 56 & 55).

On June 1, 2012, Dr. Douglas Davidson completed a consultative examination and report of Plaintiff for Disability Determination Services.  (AR pp. 446-449).  Therein, Dr. Davidson noted that Plaintiff reported she has "continual severe lower back pain that causes poor sleep hygiene, causes her not to be able to lift or bend and do most housework and causes her not to be able to sit for long periods."  (AR p. 446).  Plaintiff further reported that she has "become quite depressed with the chronic pain…."  (AR p. 446).  Dr. Davidson went on to note that Plaintiff presented as dressed neatly and appropriately, was lucid, alert, pleasant, cooperative, acted appropriately with frequent eye contact, and was friendly and polite.  (AR pp. 448-449).  He noted adequate speech, normal memory, and a "largely depressed" mood with "much hostility." (AR p. 449).  Dr. Davidson opined that Plaintiff's affect was appropriate and possibly exaggerated, and that her concentration, abstraction, cognition and comprehension were unimpaired.  (AR p. 449).  Further, he opined that Plaintiff was able to "sit, stand, walk and do light exertional activities as tolerated," was able to lift/carry or push/pull 10-20 pounds, could use

her hands for repetitive actions, fine manipulation and all grasping. (AR p. 449).[19] While Plaintiff could not bend, Dr. Davidson noted she was able to squat, stoop, kneel, crawl, climb, twist, reach and turn. (AR p. 449).

A Disability Determination was completed on June 1, 2012 and affirmed by Dr. Knott. (AR pp. 70-78 & 460). It appears that the determination was based on records received from the Veteran's Administration (including Dr. Jackson's mental health sessions), Dr. Davidson's consultative examination, and Dr. De Araujo's records. Therein, Plaintiff was assessed as able to stand/walk for six hours in an eight hour day and sit for six hours in an eight hour day. (AR pp. 70-78).

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ's RFC decision can be supported by substantial evidence even if the ALJ does not specifically discuss all the evidence that supports his or her decision or all the evidence that he or she rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). The court "may only scrutinize the record" and take into account whatever fairly detracts from the substantiality of the evidence supporting the ALJ's decision. *Leggett*, 67 F.3d at 564. Accordingly, a "no substantial evidence" finding is

---

19 Plaintiff places emphasis on Dr. Davidson's opinion that she can do light exertional activities "as tolerated" and argues that this qualifier "reduces the statement to one that offers absolutely no probative value whatsoever." (Rec. Doc. 5 p. 12). Despite Plaintiff's argument, Dr. Davidson goes on to place specific restrictions on Plaintiff's activity (i.e., Plaintiff is unable to bend) and outline Plaintiff's specific functional abilities. (AR p. 449). The objective findings set forth in Dr. Davidson's opinion are adequate to allow the ALJ's consideration of same.

appropriate only if there is a conspicuous absence of credible evidentiary choices or no contrary medical findings to support the ALJ's decision.   *Johnson*, 864 F.2d at 343-44.

The ALJ's decision makes clear that the ALJ considered all of Plaintiff's medical records as well as Plaintiff's testimony in developing his opinion of Plaintiff's RFC.   The ALJ gave Dr. Davidson's opinion "significant weight," explaining that the opinion was supported by findings upon examination and "consistent with the functional capacities evaluation noted by Dr. De Araujo…."   (AR p. 22).   The ALJ gave the Disability Determination "significant weight," explaining that the determination was "consistent with the record as a whole, including the progress notes of Dr. De Araujo…which show the claimant was relatively comfortable as long as she avoided heavy activity as of December 2009 and only experienced increasing radicular pain with more than light activities as of February 2011."   (AR p. 22).   The ALJ partially accepted Dr. Staires' July 7, 2010 opinion as set forth in the Physical Capacities Assessment Form. Specifically, while the ALJ found Dr. Staires' opinion that Plaintiff could perform light work consistent with the record as a whole, he found "the limitations to sitting 3 hours in an 8-hour day, standing 3 hours in an 8-hour day, and walking 1 hour in an 8-hour day and the restriction on operating foot controls…unsupported by the record" and noted the absence of any treatment notes from Dr. Staires after December 2008.   (AR p. 23).   Based on Plaintiff's own testimony at the hearing, the ALJ found Plaintiff "must sit after standing for two to three hours and must stand after sitting for thirty minutes" and was "limited to simple, routine, and repetitive tasks; no interaction with the general public; and occasional interaction with coworkers and supervisors."   (AR p. 22). As explained above, the ALJ gave little weight to Dr. Jackson's Mental Medical Source Statement, finding the statement unsupported by Dr. Jackson's own treatment notes.

19

Review of the medical records and opinions contained therein, as well as Plaintiff's own testimony, indicates that the ALJ's determination of RFC was based on substantial evidence. Because substantial evidence exists to support the ALJ's determination of the weight to be given to the various medical opinions and records (including the PCAF completed by Dr. Staires) as well as Plaintiff's RFC, this is not a ground for remand or reversal.[20]

### 3.   The Side Effects of Plaintiff's Medication

Finally, Plaintiff argues that the ALJ committed reversible error by not considering the "sedative and cognitive" side effects of Plaintiff's prescribed medication.  (Rec. Doc. 5 pp. 13-14).  Under the social security regulations, "the Commissioner is required to consider the 'type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [ ] pain or other symptoms.'"   *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 CFR 404.1529(c)(3)(iv)).

Here, Plaintiff testified that due to her medications she "can't concentrate on one thing at one time…."  (AR p. 35).  Later in the hearing, Plaintiff stated that she had some memory problems.  (AR p. 44).  The ALJ's decision noted Plaintiff's testimony that "she is unable to concentrate and feels uncomfortable around others…", and "giving the benefit of the doubt," found Plaintiff limited to "simple, routine, and repetitive tasks; no interaction with the general public;

---

20 While the ALJ concluded that Plaintiff was unable to perform her past relevant work based on her RFC with the restrictions he felt applicable, based on Plaintiff's age, education, work experience, RFC with limitations, and the hearing testimony of the vocational expert, the ALJ found that the Plaintiff would be able to make a successful adjustment to other work that existed in significant numbers in the national economy.  (AR pp. 23-24).   Therefore, the ALJ concluded at the fifth step that the Plaintiff is not disabled.  (AR p. 25).  As the court understands it, Plaintiff is arguing on appeal that the ALJ's determination of Plaintiff's RFC was incorrect.  Plaintiff does not argue that the vocational expert's determination that other work existed for a hypothetical claimant with the as-determined RFC was incorrect.

and occasional interaction with coworkers and supervisors." (AR p. 22). Other than the ALJ's reliance on Plaintiff's testimony to place restrictions on her RFC, the ALJ did not analyze any possible side effects of Plaintiff's medications.

Procedural perfection is not required in administrative hearings, and a court will not vacate a judgment unless "the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). Thus, Plaintiff must establish that the ALJ's error casts into doubt the existence of substantial evidence to support the ALJ's decision. *See Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). Courts have explained that in order to show such prejudice, the Plaintiff must point "to evidence that would have been adduced and that could have changed the result." *Brock v. Charter*, 84 F.3d 726, 729 n. 1 (5th Cir. 1996).

In addition to her testimony regarding concentration and memory issues, the record indicates that Plaintiff reported drowsiness and dry mouth as medication side effects. (AR p. 182 & 184). As defendant correctly points out, Plaintiff also reported to Dr. Jackson that "taking morphine 'gives her energy,' and she is always looking for something to do." (AR p. 241). In his July 7, 2010 Physical Capacities Assessment, Dr. Staires noted that Plaintiff is "stable on current meds without cognitive side effects." (AR p. 467). Accordingly, the record does not support, and Plaintiff has failed to point out, any documentation of sedative or cognitive medication side effects not accounted for by the ALJ in his RFC determination. Moreover, the evidence in the record – specifically, Plaintiff's self-report of additional energy when taking morphine and Dr. Staires' assessment that Plaintiff was experiencing no cognitive side effects – supports a conclusion that Plaintiff's substantive rights were not affected by any failure to more deeply address potential medication side effects. Accordingly, even assuming the ALJ's

limitation on Plaintiff's RFC to account for her testimony regarding problems in concentration was insufficient, the failure to address side effects of Plaintiff's medication more specifically was harmless error.

## VI.     Conclusion

The analysis above demonstrates that the Plaintiff's claims of reversible error are without merit. The record considered as a whole supports finding that the ALJ applied the proper legal standards and substantial evidence supports his determination that the Plaintiff is not disabled.

## RECOMMENDATION

It is the recommendation of the magistrate judge that under sentence four of 42 U.S.C. § 405(g), the final decision of the Acting Commissioner of Social Security Carolyn W. Colvin, denying the applications for disability and supplemental security income benefits filed by plaintiff Cynthia Claire Miller, be affirmed and this action be dismissed.

Signed in Baton Rouge, Louisiana, on February 25, 2016.


**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

22